AEROPOSTALE AEROPOSTALE Mr. Parker, whenever you're ready. Good morning, Your Honors. May it please the Court. My name is Thomas Parker. I represent the appellant, PICTURE PATENTS, and I'm telling it in this manner. I also just want to note that we have reserved three minutes for rebuttal. Your Honors, there are a number of issues in this case, and Your Honor, for the sake of brevity, I'd like to just, the first issue I'd like to jump into, if possible, is to just discuss the matter with respect to IBM's employment agreements, and my client's contention that the District Court erred in finding that her invention, what we refer to as Pictorial User Interface, fell within the scope of IBM's employment agreement. At the time, Your Honors, during Ms. Baker's employment with IBM, she was a graduate student at Columbia University. Now, when she executed the employment agreement, she intentionally modified the scope of the agreement when she wrote Columbia University on the second page of the agreement. She wrote Columbia University to ensure that any invention that she came up with while she was a graduate student, in her capacity as a graduate student, would be excluded from the scope of that agreement. She had no prior agreement with Columbia. Your Honor, she testified in her deposition that she did have a prior agreement, an arrangement with Columbia. That did not necessarily give her the right, an unfettered right, to assign any of the work that she had conceived of or come up with while a graduate student, or in the capacity of a graduate student at Columbia University. So your answer is that she had a prior agreement, but that prior agreement did not prevent her from assigning an invention to IBM. Your Honor, she had an arrangement, an agreement, prior agreement with Columbia. In order for her to assign anything, I think at the time when she was a grad student, she would have had to at least disclose the invention, make some sort of a combination of arrangements with Columbia University. So did it preclude her from assigning the invention to IBM? Yes, it did, Your Honor. It did. That's why she wrote, and there was two things, two aspects of her testimony, which she said she had a prior agreement because she was a graduate student. She also gave an example of where there wasn't a situation unrelated with respect to the subject matter of this invention, where she came up with something during her capacity as a graduate student, and Columbia University asserted rights, or at least they were consulting Ms. Baker about rights in light of her relationship with Columbia University. Didn't she say in A1164 that she had no developments in which she had any right, title, or interest in which were previously made or conceived solely or jointly by her or written wholly or in part by her and so on? That's the language in the agreement. In the right, and she wrote the words none, I believe. Right, but our reading of that provision was at that time, the PUI, the invention, was not in existence then. She had thought about the problem, but it was not at all conceived of or developed at that point in time, and so she wrote the words none in that agreement at that point. Now, with respect to, I know in IBM's brief they've made comments to the effect where there's email exchange where she would say, where there were statements to the effect where it was not part of my dissertation, the PUI, and that is true. It was not part of her dissertation, her PhD dissertation, but it was within the confines of her responsibilities or her actions as a graduate student, and in fact, the words Columbia University, as she wrote it in the agreement, was an intent to modify the scope of the agreement, and that has to be construed, and as construed as our position, we respectfully submit that what she was intending to exclude was any work that she had developed or came up with while a grad student in the capacity of being a grad student at Columbia University. I missed in the record where she assigned these rights to Columbia in the picture. No, as of now, no, no rights were ever assigned to Columbia University. The invention was disclosed to Columbia University at some point, but it was not assigned to Columbia University. Isn't that what you're saying she said she was bound to do? No, no, what I'm saying, Your Honor, is that the agreement with her, with Columbia University, as she understood the agreement, was that she did not have an unfettered right to just give away or just assign away inventions that she came up with that were part of her task or part of her capacity as a graduate student. In other words, the fact that she didn't have a strict obligation not to assign didn't necessarily mean that she could assign, and that's, Your Honor, a very important distinction that we would like to make and we believe the Court earned. What about the paragraph where it says, I'm not sure, I'm reading from the District Court's opinion, develops, the IP agreement says development is not assigned by paragraph four in which she has any right, title, or interest, so on and so forth, and she wrote in there none. Right, in this particular case, my reading of this provision was that the PUI, the invention, the claim of invention that's in dispute, at this time, was not even in existence. So at this point in time, she had... So if it was not in existence, how could it be covered by the Columbia University, any relationship she had to Columbia? It's just, again, it's just a question of her relationship with the university. That work that you're doing, that you just can't run off and just assign it and give it away to third parties, they have some, at least her understanding of her arrangement, her agreement, or the relationship with Columbia University, would be anything that she would come up with as a graduate student. Well, why do you have jurisdiction before the Court, then, if she has no interest? I mean, what you're telling us is it's either Columbia or IBM. No, we're saying that actually all three, I mean, because Columbia had at least the ability to review, to consider. Now, Columbia University, there's nothing that came about, anything at Columbia University with respect to this invention over time. So it's not a question of whether it was Columbia University who owned it or whether IBM owned it. It was a question of, she had a situation that she was involved in. I mean, she was a part-time, she was a full-time student, and her job was, it was a part-time job at IBM, and she wanted to specifically carve out whatever she did as a graduate student. Not to be trite, but are you familiar with a game called Three-Card Monty? Yes, I am. Well, I don't have anything more to say then. Well, then, Your Honor, perhaps then, maybe that is not fully fleshed out on the record as to how this all would play in, and to whether or not this would be a sufficient record to construe the agreement as what she wrote and the import of what she wrote in terms of rights. Your Honor, with respect to another issue as well is, you know, there was counterclaims and defenses that were asserted by IBM. Counterclaim, they asserted a declaratory judgment for declaration of ownership, as well as affirmative defenses with respect to their ownership, Japan's lack of ownership, and affiliate state of claim. And the lower court, and we asserted that the statute of limitations would bar those claims, but the lower court said, well, you know what? The statute of limitations apply to both the counterclaim and affirmative defenses, and the lower court looked to Section 203D under New York law. And, Your Honor, of all the cases that we reviewed, that statute is very specific. It's directed to, it's a codification of the equitable doctrine of recruitment. That's what the statute is, and that's what all the cases have said. And also what the cases... But doesn't the statute, the statute doesn't bar or defense a counterclaim arising from the same transaction, does it? It does not to the extent the defense is not a, asserting affirmative relief, and it's simply looking to mitigate an adverse recovery. Then the statute of limitations would not be applicable under those circumstances. But here, we would submit to this court that IBM's claim of ownership, its affirmative claim, and even its affirmative defenses, which are not affirmative defenses because they really don't introduce any additional elements above and beyond our primary case of ownership, that there would not, it's not akin to recruitment. Because we're not seeking damages, we're not seeking liability as to, as against IBM, and IBM's not looking to mitigate any liability that they may be exposed to. And so what essentially the global court did, we would respectfully submit, was really grant IBM affirmative relief by granting their motion, well, by granting their motion of summary judgment and providing them a declaration of ownership. And that would be affirmative relief that all the various New York courts have basically said that this is what, this is the limit, at least to some extent, of Section 203D. The district court, of course, disagreed with you. He said it's akin to a recruitment claim. Yes. And there are several cases that he cites from New York. Right, and he also... I'm sorry, I apologize. No, go ahead. He also relies upon the case of the 118 East, 118 Street Co-op. But that case is distinguishable. And, Your Honor, if I may just quickly explain... Which case is that now? Is that Bloomfield? No, actually, I'm going to get to Bloomfield in a quick second. This is 118 East 60th Owners... Oh, okay. Okay, and that's 677 F 2nd, 200 2nd Circuit. I mean, that case, Your Honor, I mean, although the facts are complicated, and I can go over the facts for that, but what the court ended up holding, ultimately, was that plaintiff cannot use Section 203D to assert a stale or otherwise time-barred claim. I mean, that's what the holding was. And, in fact, nowhere did the court in this particular case say that 203D allowed an affirmative relief as the district court gave IBM in this particular case. But I think, as I recall, what the district court said about that case was that that case dealt a lot with the policy considerations. And so the district court says if it were to rule otherwise, it would create an incentive to the other side to delay bringing some claims until a counterclaim would be time-barred. So the district court also applied the 118 case, right, to reach the result that it reached. It applied it, and it also looked to the policies that were also enunciated in that case, but those policies don't even apply here because this is not a situation where Pitcher Patents or Intellinet or Michelle Baker sat around and waited for the appropriate moment to bring an action against IBM. It had no choice. It had to bring, it had to resolve the ownership dispute with IBM because it had a pending action against other defendants who raised and claimed and said that, look, Pitcher Patents, you don't own the patent, IBM does. We contacted IBM. They were not at all responsive. We attempted to resolve or do whatever, and so we felt we had no choice but to go to the court and to bring some sort of action to get resolution of the ownership dispute. It was not a situation where we were sitting around just waiting for the right moment for the clock to tick, the moment the statute of limitations expires, run for court. No, I don't think the court, I didn't read the court's analysis as suggesting that that was true of your case. What the court was articulating was why he thought the policy reasons should allow him to construe the statute in a particular way, in general, not with respect to necessarily applying it. I understood, Your Honor, and notwithstanding those policy considerations, I do think, though, the statute is fairly straightforward in terms of its intent, in terms of what it was trying to accomplish, and again, I would go back and I would say that IBM's affirmative claim, even their affirmative defenses, which, again, are not defenses, is not akin to a recoupment, and I just can't reconcile nor try to say, well, they don't really explain in their briefs as to why it's akin to a recoupment, or why it falls within the equitable doctrine of recoupment in their own papers, and I, quite frankly, I can't either. Your Honor, there's also some other issues as well, and that is, if you notice in our papers, we raised the issue of adverse possession, Your Honor, and they assert in their papers that, look, this never came up, this is being raised for the first time. Your Honor, it was not. In fact, defendants down below said to the district court in their papers and during oral argument that our affirmative claim of ownership was akin to a claim of adverse possession, and since there are no cases... Adverse possession is open, notorious, and unopposed, isn't it, from the bar. IBM was consistent in telling your client that they opposed. When didn't they? Your Honor, there was a situation where there's a couple of things, okay. First, I mean, if you look at the totality of the interplay in the relationships and the communication she had with IBM, and if you look at it, there was just one single memo written by her supervisor saying IBM retains all rights. Excuse me, but I seem to recall depositions testimony where an IBM representative says that he told her when she left, told her when she left, that she didn't have that right. Am I missing something? I mean, isn't that true? That's IBM's testimony. Michelle Baker denies it. Her version of her discussion... It is an email, right? There is a memo from one individual from her supervisor. They are right on with the time she was terminated. At the time she was terminated, Your Honors, she went to Mr. McCurdy, Dr. Grossman, and Mr. Purcello, who was IBM's patent counsel. She flat out said to them, and she testified to this, that look, if we're not going to be able to make a deal together, if you're not interested in my invention, then I will go out on my own and I will find some other ways. She certainly indicated she was going to file a patent application and she was going to patent it. In fact, let me just go to Mr. Purcello because this deals with latches, just real quick. He was aware of all this information. She had the invention disclosure. She didn't return her copies of the invention disclosure. She didn't sign it. All this Mr. Purcello knew. He also knew that she was going to file a patent application. At his deposition, we asked Mr. Purcello, why didn't you take any action? Why didn't you do anything? Well, one of his comments was, well, I didn't have an address. It would have taken too much work. And later in his testimony, he said, well, I guess I could have gotten her address by the personnel records. Those were one of his excuses. Now, obviously, he said, well, granted, it's an automatic assignment. I didn't have to do anything. But he knew she was going out. He also characterized her conduct as misappropriating intellectual property and he said that, yes, IBM has taken actions against employees who take information from IBM, which he knew. He did nothing. He neglected. He did not take any action against her, which I believe we will represent that he should have. Now, the lower court, in applying the Latches Doctrine, said that we didn't show inequitable conduct or prejudice. Well, I do believe we showed prejudice, but I don't understand what's meant by inequitable conduct. For Latches, I think really what you need to show is certainly that you had an opportunity to correct a wrongdoing if you believed it was a wrongdoing. And Mr. Purcello testified that we believed what she was doing was wrong. And so nothing had happened for a period of 16-plus years. Life had gone on. She went, developed the invention. She formed her own company, invested a lot of 5,000-plus hours of time and over close to $200,000 of her own money. Well, you've exceeded your time and more. We'll give you one minute for rebuttal. Thank you, Your Honor. And let's hear from the other side. I understand the counsel is dividing up its argument. Yes, that's correct. All right, we're going to start with you with 11 minutes. Yes, that's correct. I'm Mark Abate for IBM, if it may please the Court. I'd like to address two issues this morning. The first, the Columbia University clause, and then second, the statute of limitations and equitable defenses. So under the IP Rights Agreement, Ms. Baker assigned to IBM inventions she made or conceived at IBM while employed in a technical research or programming capacity, and if those inventions were related to IBM's business or research and development. Slow down, Mr. Abate. One of us is from the West. It goes well in the New York courts, maybe not so well here. What about your friend's comments about the Columbia University agreement, which he did fill in in the employment agreement? Well, the Columbia University clause, how I refer to it, it's absolutely unambiguous. In the context of the assignment clause, which assigns inventions related to business and R&D and also inventions that were suggested by or resulted from any tasks assigned or work performed by Ms. Baker, the Columbia University clause is an exception. It's in the same paragraph as the assignment that I was just talking about, paragraph four, and what it says is, excluded are developments that I cannot assign to IBM because of a prior agreement with Columbia University. Now, Ms. Baker testified unequivocally. This is on page 2601 of the appendix. The question was, was there any agreement with Columbia University that would prevent you from assigning developments to IBM? The answer is no. It's unequivocal, and in fact, at the oral argument, the district court had the same question Judge Wallach raised. Well, you're not saying that Columbia University has rights here, and Mr. Parker said no. Columbia University has no rights, and that's what her testimony establishes. There's no agreement with Columbia that would prevent her from assigning the invention to IBM, and in fact, she did assign it to IBM. It may not be apparent from the briefing, but in addition to all the parties producing documents in this case, Columbia was subpoenaed, and Columbia produced documents and provided a witness for deposition, and no agreement was produced by anyone. So in addition to Ms. Baker's clear testimony that tracks the language of paragraph four, there's in fact no agreement in the record with Columbia University that would prevent her from assigning the invention to IBM, and the district court found that Picture Patents had conceded that Columbia had no claim to the invention, and that the IP rights agreement didn't preclude her from assigning it to IBM. What they argue here is that by writing in the word Columbia University, what she intended to do was limit the entire agreement to work she was hired to perform. Well, that's not in the Columbia University clause. It's clear by its plain language, and it doesn't say anything about work hired to perform, but in addition, what they're trying to do is strike paragraph 4A from the agreement. What they're saying is by writing the word Columbia in the agreement, she struck paragraph 4A, and she rewrote paragraph 4B from the language we see in paragraph 4B to this other language they prefer the work hired to perform, and there's just no basis to do that. That would be a total rewrite of the agreement. In addition, the argument is that Ms. Baker's intent, her understanding, her assumptions create an ambiguity or raise an issue of fact. Well, that's just contrary to New York law. I mean, the district court cited the WWW Associates case as a leading New York case cited over a thousand times. It is very unremarkable in what it says. It says you look to the plain language of the agreement. If that's clear, you go no further. You don't try to create an ambiguity by looking at extrinsic evidence. Only if we see an ambiguity on the face do we bring in extrinsic evidence, and the case also stands for the proposition that one party's intent that's contrary to the plain language cannot be used to raise an issue of fact. And I think that's the law in New York. I think that's black-letter law throughout the land. I would turn to the statute of limitations if there are no questions on the Columbia University issue. On the statute of limitations, it doesn't apply for three independent reasons. The first is Section 203 of the New York Code, which states that counterclaims and defendants are not barred by the statute of limitations. And what the district court said was these were mirror image claims. Picture patents, if you look at the Fourth Amendment complaint, picture patents has claimed ownership of the invention and that IBM doesn't own it. And we say the exact opposite. IBM owns it, picture patents doesn't. The court said these plainly arise out of the same transaction or occurrence, and that is the IP agreement, Ms. Baker's conception and reduction of practice at IBM, and the fact that this relates to IBM's business and research and development. And the court also mentioned that IBM's claims and defenses do no more than negate her claims, and therefore they're not beyond the extent of the demand in the complaint. What Mr. Parker argued here and in the brief is that this is limited to traditional notions of recruitment, and the district court distinguished those cases. Those cases deal with, cases cited by picture patents, largely deal with set-offs versus recoupments, and sometimes when you have a set-off, it can be broader than the notion of recoupment. It doesn't have to relate to the same nucleus of operative facts. Did IBM have knowledge or reason to have knowledge that she filed a patent application, there was a patent out there, which she was pursuing vigorously? No, no. You know, it's important to note... Well, they had a hint of that. If you take the email as being accurate, the manager told her in no uncertain terms, this all belongs to IBM. That's some suggestion that there's something going on out there, right? Well, there's some suggestion that she was making a claim to the invention, and we set that straight and we said, no, this is our invention and we're not relinquishing rights to it. You know, it's very interesting... So you were aware of the invention? At that time, we were aware of the invention. You know, a couple things. One is, remember at that time, patent applications were not published, so the first patent in this family didn't issue until 1998, five years after she left. Also, the evidence is she didn't leave the invention disclosure behind at IBM. She actually took it with her. She retrieved it from the technical employees she gave it to. She testified she didn't sign it while at IBM because she knew that IBM wouldn't act on it. She also testified that it was never submitted to the IP law department. So I don't know, what is your position, that you had no basis for knowing that she had filed a patent or that you knew it and didn't act on it because it belonged to you? We had no basis for knowing that she had filed a patent. And in fact, that's an interesting point because in their brief, they say a couple of times that she represented to IBM that she was going to file a patent, and the fact of the matter is that's not true. There's not one contemporaneous document in all the emails where she says, I'm going to file a patent. And in fact, Mr. Parker conceded that she was going to pursue the invention. Correct. But she never says, I'm filing a patent. See, that would have been a galvanizing event for possibly IBM to do something. She said, it's my invention, I'm going to file a patent. And we said, no, it's our invention. And I wanted to point to, I think it's important to look at the memo that preceded what we call the departure memo. In the memo that preceded it, Ms. Baker writes to IBM, and she says, I assume that IBM is relinquishing its rights. That language is very interesting. She's recognizing IBM rights. And this was after all the meetings that she's alleging, all the meetings with business people and that, where she says the agreement may have been modified. Isn't that where she draws that response that says, no, your assumption is wrong? Correct. But it's interesting the language she chose to use, because she's recognizing IBM's rights in her own language. I assume IBM is relinquishing its rights. And then we write back and we say, no, we're not relinquishing any rights. The invention is ours. So that exchange, I was talking about statute of limitations, but I'll turn a second to the equitable defense. That exchange addresses all the equitable defenses, equitable estoppel, latches, and the other defenses, because each of those defenses requires, well, I should say, latches and equitable estoppel require misleading conduct by IBM and additional lack of knowledge or notice by picture patents. And it's clear through that exchange, through the departure memo and the memo that preceded it, that Ms. Baker and picture patents were well aware of IBM's claim. So latches and equitable estoppel don't apply, and waiver and modification require a knowing voluntary waiver or a mutual assent. And again, it's clear through that exchange that that did not happen. That was the final communication between IBM and Ms. Baker until 2008 when what happened, this litigation was commenced, I believe it was in 2007, and in discovery, the infringement defendants discovered the potential for IBM's claim of ownership and then served a subpoena on IBM. That's the first time we learned of it. And then what we did at that point, it did take us a little time to investigate the claim, to look at our records, to see what this was about. And then in response to picture patents' request, we conceded to or agreed to allow them to join us in the case, and that's when they filed the Fourth Amendment complaint. But I should turn back to Section 203 for a second on the statute of limitations. And let me mention on the 60th Street Owners case, the court did apply the policy in that case, the policy being, which again I would say is unremarkable, the policy being prevention of stale litigation and the protection of repose. That's been recognized by the Supreme Court in a number of cases and also by this court in the Stanford case where you followed the Supreme Court. And the court talks about fairness. In particular, it would be inequitable to allow one party to raise a claim and then to prevent another party, the defendant, from attacking something going to the foundation, an issue going to the foundation. And that's exactly what's happening here. The issue they've raised in their case with the infringement defendants is ownership of the patent, and our issue is, no, we own the invention. We own the invention that's straight at the foundation, and we're entitled to raise that under Section 203, and that's what the district court held, and that's what the 60th Street Owners case would suggest. The interesting fact about that case, or the point that Mr. Parker was raising, there the plaintiff brought an action, and the plaintiff said, I'm relying on Section 203, and the Second Circuit said, well, we recognize these policies, but you're the plaintiff. You can't invoke Section 203. And the plaintiff said, well, I'm anticipating a hypothetical case that could be filed against me at some point in time by the defendant. And the court said, well, you can't do that. So it is true that the court found 203 didn't apply there, but that's because it was the plaintiff in the litigation attempting to invoke 203. Here we're in the defensive posture as the district court recognizes it. But there are two other reasons why. Well, your time, your division of time has concluded, so you're aiding into Mr. Cummings' time. I will do that. I appreciate your consideration, and I would respectfully request affirmation of the summary judgment. May it please the Court, I'm Nathan Cummings. I represent the defendants in this case. There's just a couple of points from Mr. Parker's presentation that I would like to respond to. But I guess first of all, I just want to make clear that defendants agree with IBM's argument, and we join that. I don't feel like I need to duplicate any of those arguments. The first thing is, regardless of the merits of Pitcher Patton's defenses vis-à-vis IBM, those defenses are not applicable to the defendant's standing challenge. And that was a principle that was made clear in the Stanford case. And the flaw in their argument, in Pitcher Patton's argument, that it should apply to us, is that equitable estoppels, statute of limitations, and the like, they don't convey title. And so under the Film Tech case, and the automatic assignment in the IBM invention agreement, title vested in IBM when the patent issued, title in the invention vested when it was created. Statute of limitations, equitable estoppels, don't have the effect of transferring title back to Ms. Baker or Pitcher Patton. So even if IBM is barred from an affirmative defense, that doesn't bar the defendants from challenging standing. I think the court in Stanford said it best in paraphrasing for this case, while IBM's failure to timely seek a judgment of ownership might defeat its counterclaim, it does not alter the fact that Pitcher Patton's cannot establish ownership of Baker's interest and lack standing to assert its claims of infringement against defendants. The next point that I'd like to address is Pitcher Patton's mistaken position that the district court erred in resolving factual disputes. And the one that Mr. Parker particularly mentioned this morning was the meaning of the Columbia Clause. To begin with, the district court's decisions were based entirely on undisputed facts of record and Pitcher Patton's own concessions. And so the court had no need to resolve any factual disputes because there were none. But even if he did, under Second Circuit law that was entirely appropriate to do because defendants' motion was challenging jurisdiction. And the rule in the Second Circuit is where jurisdiction is challenged, the court must resolve any disputed jurisdictional fact disputes in order to determine if the court has jurisdiction and those factual findings are reviewed for clear error. Pitcher Patton's has not identified any clearly erroneous fact findings. So we submit that the dismissal for lack of standing should be affirmed. So unless the court has any other questions, I thank the court for its time. Thank you. Thank you, Your Honors. Just a couple of points, Your Honor, real quickly. One thing as far as knowledge of the patents, I would submit that IBM certainly had constructive knowledge as early as 1996 when the first PCT application published. And then there are the subsequent patents that were issued therefrom, so they certainly had constructive knowledge. Your Honor, with respect to the invention disclosures, at least giving the impression that IBM had no access to the invention disclosure, this invention disclosure was written through IBM's system. It was written on their server. When asked, Mr. Purcello, did you bother to search the server for the invention disclosure when she was terminated from her appointment, he testified, no, we didn't bother. So through the passage of time, perhaps it got lost and they were unable to find it today. And that brings to the point with respect to Columbia. They did subpoena Columbia University. Columbia testified that this is all the documents they had. They didn't say there was no agreement. They just said they couldn't find whatever it was that you were looking for. This is all we have. And this goes to laches. When a period of time just elapses over 16 years, you're not going to have all the evidence that's really out there. Where in the record does he say we didn't bother? Okay, let me get the citation real quickly. I think if he didn't say we said we, we didn't bother. He said no. Or did he say we didn't bother? Eli said he didn't say no. My recollection wasn't that they didn't bother, but I can check that. I have the citation in my notebook. And just also with her testimony, she testified. I mean, IBM's counsel stated that there was no contemporaneous documents about filing. Certainly it was about pursuing the invention, but she testified in her declaration, in her deposition, that she told IBM management and IBM's counsel that she was going to file a patent application. That's her testimony. That's on the record. To the extent that it's believable or not believable, there's no reason to say it's not believable because it's entirely consistent with how she was acting, interacting with the people and the folks at IBM. Any final thought other than if you found the citation that Judge Wallach was asking about? I'm going to find that in a second because I had it. Okay. It is A1292,23-A1293,5. The colon is the deposition reference to. And what does it say? Since I don't believe I did, no. I don't believe that I misspoke. I apologize. All right. That concludes the arguments for this morning. The case is submitted. Thank both counsel, all three counsels. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock a.m.